SHELDON *v.* CARR.

1. WITNESSES—COMPETENCY—TRANSACTIONS WITH DECEDENTS.
    An heir suing to set aside a deed made by his grandmother, or
    to enforce a trust on the property granted by it, cannot tes-
    tify to conversations with her concerning the deed and the
    consideration moving her to execute it. Section 10212, 3
    Comp. Laws.

2. TRUSTS—ESTABLISHMENT—EVIDENCE—SUFFICIENCY.
    On a bill to set aside a deed as obtained by fraud, or to impress
    a trust upon the land conveyed, evidence considered, and *held*,
    insufficient to support a finding that the grantee promised at
    the time of the conveyance to make a certain payment to the
    grantor's daughter.

3. APPEAL AND ERROR—CONCLUSIVENESS OF FINDINGS.
    Where the court below presumably reached a conclusion based
    on all the testimony, including that of complainant, which
    was incompetent, the consideration, usually of force, that
    the court below saw and heard the witnesses, is eliminated.

4. TRUSTS—ESTABLISHMENT BY PAROL.
    A parol agreement by the grantee of land to pay a certain
    sum of money to the grantor's daughter when the land should
    be again sold gives rise to no trust enforceable in equity by
    the heirs of the daughter.

Appeal from Barry; Smith, J. Submitted February
16, 1905. (Docket No. 162.) Decided April 21, 1905.

Bill by Harvey Sheldon and another against Allen G.
Carr and others to establish an interest in certain land.
From a decree for complainants, defendant Carr appeals.
Reversed, and bill dismissed.

*Thomas Sullivan*, for complainants.

*Colgrove & Potter* and *C. S. Palmerton*, for appel-
lant.

OSTRANDER, J.   The substance of the averments of the bill of complaint is here set out:  On May 3, 1883, there was conveyed by warranty deed to Sarah Carr and defendant Allen G. Carr certain premises.   The deed was recorded, and a copy of the record is annexed to the bill. The entire consideration of $2,000 was paid by Sarah Carr, and the undivided one-half of the premises was given by Sarah Carr to Allen G. Carr as his share as an heir at law of her estate.   On August 12, 1889, Allen G. Carr, who was son and one of two heirs at law of Sarah Carr, for the purpose of defrauding said Sarah and the heirs of her body other than himself, promised said Sarah that, if she would convey to him her undivided interest in the premises, he would, after her decease, sell the premises, and from the proceeds pay Etta Sheldon, his sister, the sum of $400; if Etta Sheldon was then dead, he would pay that sum to her heirs.   Allen G. Carr never intended to perform his said promise, but made it with the deliberate and fraudulent intent of not performing, and of beating Etta Sheldon and her heirs out of their rightful share of the property of Sarah Carr.   Sarah conveyed to Allen her undivided half interest in the premises without other consideration than the said promise, and relying upon the promise, and the deed was not recorded until December 17, 1900.   From May, 1883, to the time of her death, June 4, 1890, Sarah Carr continued to occupy and control the said premises as though they were her own.   The heirs of Sarah Carr living at the time of her death were defendant Allen and his sister, Etta Sheldon.   Etta Sheldon died December 8, 1900, and complainant is her only surviving heir.   Defendant frequently informed Etta Sheldon during her lifetime that as soon as he sold the premises she should receive $400, as agreed between himself and his mother.   Defendant sold and conveyed the premises April 2, 1902, giving a warranty deed therefor, to the other persons made defendants, whose good faith as purchasers is not attacked; receiving in payment other real estate and a mortgage on the premises sold.   Since the said sale by defendant, defendant has ap-

parently avoided meeting complainant, who has not been able to attempt to obtain a fulfillment of the said promise.

The answer of defendant Allen G. Carr puts in issue the payment by his mother of the entire consideration for the premises, the promise to pay any sum at any time to Etta Sheldon, and the procuring the deed from Sarah because of any such promise. It also asserts that another daughter of Sarah Carr (Emeline Hadley) is living; that no administrator of the estate of Etta Sheldon has ever been appointed.

Upon the filing of this answer, a paper appears to have been filed, of which the following is a copy:

"[Title of cause.] And now comes the said defendant [?] and amends the bill of complaint heretofore filed in this cause by making Emeline Hadley, who is a half sister of Etta Sheldon, mentioned in said bill of complaint, and a daughter of Sarah Carr, deceased, a party complainant. Said bill to be and remain in all other particulars the same as filed, with the exception of adding the name of Emeline Hadley as one of the complainants thereto. [Signed by counsel for complainant.]"

Authority to make this amendment does not seem to have been challenged in the court below. The fact is mentioned as explanatory of the theory upon which the bill was filed.

The prayer of the bill is that the court will decree complainants to be entitled to a one-half portion of the note, mortgage, and real estate received by defendant in exchange for his property, and to one-half the rents and profits of the land after the decease of Sarah Carr; also that defendant Allen be required to assign to complainants such portion of the proceeds of sale of the land as would have been theirs if the deed from Sarah to Allen had not been made. There is a prayer for general relief. The relief prayed could only be given by setting aside the deed from Sarah to Allen, and finding that Allen had no interest in one-half the proceeds of the land.

The court below found that Allen G. Carr received the

conveyance from his mother with an understanding and promise to pay his sister (mother of Harvey Sheldon) $400, and he determines that this sum defendant Carr shall pay within 60 days, and establishes a lien for its payment on the note, mortgage, and real estate which defendant received in the trade.

We might dispose of the case without further reference to the facts. The bill, however, charges the defendant with fraudulent conduct, and the court below has, in effect, found that charge sustained by the proofs. For that reason, and because it will lead to a better understanding of the case and of our conclusions, we make a brief reference to the testimony:

The entire consideration for the deed and land was not paid by Sarah Carr. She was from some time before 1865 until her death a widow. Defendant was her only son, and a cripple. He has never married, but lived with his mother until her death. When her husband died, Sarah Carr sold some land, paid some debts, and, according to the testimony of Allen, she distributed a part of the remainder; giving to her daughter Etta Sheldon her share, or one-third. Then she and Allen together bought 10 acres of land, the title being taken in the name of Allen. Later she received a back pension of some $1,900. With some of this money and with the proceeds of a sale of the 10 acres the land in question was purchased, the deed running to Sarah and Allen. Seventeen hundred dollars was paid down, and a mortgage for $300 given for the balance, and this mortgage was afterwards paid. There is no evidence tending to show that the joint deed had any reference to, or was in any way connected with, a distribution of property, or that it was a setting off of property to Allen as heir. There is no proof that the deed from Sarah to Allen, made in August, 1889, was in consideration of a promise of Allen that he would pay to Etta Sheldon or her heirs $400, or any other sum, at the decease of Sarah, or out of the proceeds of a sale of the premises, or at any other time, unless found in inferences

139 MICH.—42.

to be drawn from certain of the testimony. There was no valuable consideration paid by Allen to his mother for this deed, excepting his lifelong care of her. She lived to be 73 years old. The testimony referred to is that of complainant and of the witnesses Martin and Mary Cole, Charles Phillips, and Charles Roscoe. Of this, the testimony of complainant was and is challenged as incompetent, because facts stated by him were equally within the knowledge of Sarah Carr. The testimony of this witness is to be weighed, as to value, somewhat by the manner of its extraction. He was 30 years old when sworn (1902), and, after stating that he was present at a talk in harvest time, 1888, between his mother, Allen, and Sarah, the following occurred:

" *Q.* State to the court what that conversation was.

"*A.* Why, my grandmother was talking of deeding him a farm, and he was to pay my mother $400.

" *Q.* That was talked between your grandmother and Allen and your mother?

"*A.* Yes, sir.

" *Q.* What did Allen say with reference to that arrangement? Did he consent to it?

"*A.* He did.

" *Q.* Do you know whether or not at that time your mother had a deed— Your grandmother had deeded her interest. Did she deed her interest after that to Allen?

"*A.* Yes, sir.

" *Q.* After the deed was made, and various times until your mother's death, did you hear other conversations between Mrs. Carr and your mother about the matter—your grandmother and mother?

"*A.* I do not understand that question.

" *Q.* After the deed was made to Mr. Carr, here, did you hear other conversations between your mother and grandmother in reference to the $400?

"*A.* Yes, sir.

" *Q.* What were those conversations?

"*A.* My grandmother seemed to be worried about it— whether he was going to pay my mother or not—and she spoke about it.

" *Q.* Did you ever hear any conversation between your mother and Allen?

"*A.* Yes, sir.

" *Q.* In which reference was made to the $400 ?

"*A.* Yes, sir.

" *Q.* What was said by your mother, and what was said by Allen, in those conversations ?

"*A.* She needed the money, and asked him for it, and he promised to pay it to her.

" *Q.* How many times have you heard such conversations ?

"*A.* Probably a dozen times.

" *Q.* Did you ever on any occasion during your mother's lifetime ever hear Allen Carr repudiate the debt, or claim he had paid any portion of it or that he did not owe it ?

"*A.* No, sir.

" *Q.* Have you had any talk with him in reference to the matter since your mother's death ?

"*A.* I have not.   *   *   *

" *Q.* During the time you worked this farm for Allen, was Allen promising that this money would be paid to your mother ?

"*A.* Yes, sir.

" *Q.* Did he so continue to promise continually during all the years up until the time of your mother's death ?

"*A.* Yes, sir.

" *Q.* I have forgotten your answer, but did you ever have any talk with Allen about this claim after your mother's death ?

"*A.* No, sir.   *   *   *

" *Q.* Do you know whether or not your grandmother would have made a deed of the premises, had it not been for his promise to pay ?

"*A.* I don't think she would.

" *Q.* From the conversations you heard there between them, you think that promise was one of the inducements he held out to procure the deed ?

"*A.* I do; yes, sir.

" *Q.* Is it your firm conviction, had the promise not been made, the deed would not have been executed ?

"*A.* No, sir."

On cross-examination:

" *Q.* You say this talk you had there at your grandmother's house occurred in harvest time in 1889 ?

"*A.* Yes, sir.

"*Q.* Wheat harvest?

"*A.* Yes, sir.

"*Q.* That was some time after she deeded this land to Carr?

"*A.* No; that was before.

"*Q.* You didn't know she had made a deed to Allen in 1888?

"*A.* I did not.    *    *    *

"*Q.* You knew when this other deed was made?

"*A.* Yes, sir.

"*Q.* When did you say that was made?

"*A.* August 12, 1889.

"*Q.* You are sure it was at harvest time—just before?

"*A.* Yes, sir.

"*Q.* Allen had a half interest in this farm anyway, didn't he?

"*A.* Not that I know of.

"*Q.* You have examined the records?

"*A.* Yes, sir.

"*Q.* You never learned that?

"*A.* No.

"*Q.* You knew he had a deed of half of it?

"*A.* No.

"*Q.* And always had a deed of half?

"*A.* I never knew it."

Witness further testified on cross-examination that after his grandmother's death he rented this farm for four or five years, and settled with Allen; that he never went to Allen about this matter.

The witness Martin Cole testified that he never heard Mrs. Carr say anything about the deeding to Allen, and never heard Allen Carr say anything in regard to the deed, but that at his (witness') house, at a time when Allen Carr, witness, his wife and children were present, he heard Allen Carr say—

"That he was to pay his sister some money, and after the deed was drawed—after the deed was made— I have just forgotten what time—whether it was at his mother's death it was drawn in that way.

"*Q.* How much did Mr. Carr say he was to pay his sister?

"*A.* I think, $400.

"*Q.* He was to take the farm?
"*A.* Yes, sir."

He says this conversation occurred about three years ago.   Later on he says it was about four years ago.

"*Q.* In that conversation at that place did he state how this indebtedness—how this indebtedness to Etta Sheldon originated?
"*A.* Why, no; I don't think he said anything in regard to that—how it was originated—more than he was to pay Ettie.  He owed her some money—$400—and she wanted the money.  At times she wanted some money."

The witness Mary Cole testified that she heard Sarah Carr, in her lifetime, say that she was going to deed Allen the place.  She said he had always lived with her, but Allen was to pay her a sum of money, "but she didn't tell me just how much, but he was to pay her some money;" that since Sarah Carr's death she had been up to the Sheldons, and found her worrying about money, and that, coming home, she told Allen Carr about it, and he said he owed it to her, and, if she really wanted it, he would get it.

The witness Roscoe served the papers in this case upon the defendant Allen Carr, and he testified that defendant said, "I don't think I will have any lawyer;" that he said he guessed Harvey had some kind of a claim; he had been looking for something of that kind.

The witness Charles Phillips testified to having had two conversations with Sarah Carr—the last one a year or a year and a half before her death, and the first one a year prior to that one—at which no one was present but himself and Sarah Carr.  He testified that his hearing was pretty bad, and had been for a good many years; that Mrs. Carr said to him, in substance, that she thought Allen ought to have the place, but that they were going to pay Etta money, about—she thought about $500.

Sarah Carr had a deed made to Allen of her interest in this land in 1888, executed it, and tendered it to him.  He declined to take it.  The deed was destroyed.  Allen was

not present at the drawing or execution of the deed made a year later—the deed in question. He took it when it was given him, and laid it away among other papers in the house. There is an abundance of testimony to show that Sarah Carr intended the land for Allen, and that their life together was such that her desire was a reasonable one.

Whether we treat the bill as filed to enforce a right which accrued to the ancestor, Sarah Carr (a right to treat the deed from Sarah to Allen as though it had never been made), or as one to enforce a parol trust in or concerning land, the testimony of Harvey Sheldon concerning the statements made by Sarah Carr is incompetent. He is a person within the terms of the statute ( 3 Comp. Laws, § 10212). If we eliminate the objectionable testimony given by this witness, there remains none which will warrant a finding that the deed from Sarah to Allen was procured by a fraudulent promise, or that the land, or any of it, was held by Allen in trust. With his testimony, the case is a very doubtful one upon the facts. The proof shows that Allen managed the farm while he and his mother lived together. That he owned an undivided half of it from the time of its purchase is undisputed. Etta Sheldon lived in the neighborhood of defendant until December 8, 1900, 10 years after the death of her mother. During this time her son (one of the complainants) rented the land for four or five years from defendant Allen, and settled with him. Inaction on her part is attempted to be explained by the allegation of frequent promises made by Allen to pay her. The testimony upon this subject has been already referred to. Its tendency to show any promise or acknowledgment based upon or growing out of any arrangement with his mother is equaled, at least, by the testimony offered on the part of defendant. There is no proof that defendant has since the death of Etta Sheldon avoided complainant. Complainant never applied to defendant nor conversed with him about the matter. Complainant did not know that Allen had from 1883 been

owner of one-half the land. The fact that presumably the court below reached a conclusion upon all the testimony, including that of complainant, eliminates the consideration, usually of force, that he saw and heard the witnesses.

Two distinct claims are set up by the complainants. As to both, we quote from the brief:

"It is certainly a well-established principle in equity practice that if Allen Carr procured this deed from his mother to her undivided one-half interest in the forty-four acres of land on the express promise and understanding that he was to pay to Etta Sheldon or her heirs the sum of $400, that in that case the court will enforce a parol trust in said land in favor of Etta Sheldon or her heirs.

"In the case at bar it is our contention that Allen Carr procured the deed upon his express promise to pay this $400 to Etta Sheldon; that Sarah Carr continued in possession of the land up until the time of her death; that Allen Carr always recognized this trust arrangement, and never repudiated it, until within a short time before the filing of the bill of complaint in this case, and not until after the death of Etta Sheldon. It is our contention that the rights of Sarah Carr in the premises descended to Etta Sheldon and her personal representatives."

It is to be noticed that none of the testimony is addressed to any agreement except the alleged agreement to pay to Etta Sheldon or her heirs $400; that, as averred in the bill, payment was to be made after death of Sarah Carr. We assume, upon the proofs, that this alleged agreement rested wholly in parol. No mention is made of it in the deed. No proof of any such agreement is made, excepting by the testimony of Harvey Sheldon; and the conversation he gives us, if occurring in 1888, occurred prior to the making of the deed. Besides, counsel for complainants speak of and treat it as a parol agreement or trust. The case of *Thompson* v. *Marley*, 102 Mich. 476, is authority for the proposition that there is no such trust averred or proven as can be declared or enforced in equity. The same case is said by counsel for complainants to be authority for the proposition that if Allen procured

the deed by fraud, with intent not to carry the agreement into effect, Sarah Carr might at any time have filed a bill to set the deed aside, and, having died without so doing, her rights devolved upon her heirs or personal representatives.    Her personal representatives are not here.    If *Thompson* v. *Marley* is authority for holding, under the facts of this case, that the heirs of Sarah Carr might set aside the deed to Allen—a proposition we do not discuss—still the court below found against complainants upon that theory, and they have not appealed.

The decree can only be sustained as a declaration and enforcement of a trust made void by our statutes.    It is reversed, with costs of both courts, and a decree will be entered here dismissing the bill of complaint.

CARPENTER, BLAIR, MONTGOMERY, and HOOKER, JJ., concurred.