## MOON *v.* PERE MARQUETTE RAILROAD CO.

|143   125|
|151   ²637|

1. NEGLIGENCE—PERSONAL INJURIES—ACTIONS—EVIDENCE—SUBSEQUENT PRACTICE.

   In an action by a locomotive fireman against his employer for personal injuries sustained in a collision between trains, happening through failure to stop his train for orders, evidence that subsequent to the collision defendant changed its rules and adopted a different method of stopping its train at that point is inadmissible.

2. MASTER AND SERVANT—INJURIES TO SERVANT—NEGLIGENCE OF MASTER—EVIDENCE.

   In an action by a locomotive fireman against his employer for personal injuries sustained in a collision between trains, happening through failure to stop his train for orders, evidence examined, and *held,* to so strongly require answers opposite to those returned to two special questions submitted to the jury, relative to the negligence of the train dispatcher, that a motion for new trial should have been, for that reason, granted.

ON MOTION FOR REHEARING.

APPEAL AND ERROR—REVERSAL—SPECIAL CONCURRENCE—PROCEDURE AFTER REMAND.

   Where all the sitting justices concur in reversing the judgment

and ordering a new trial on one of the grounds discussed in the opinion, the withholding by one of them of his assent to the conclusion that the court below should have granted a new trial because the weight of the evidence on certain points required it does not amount to a dissent nor can it in any manner affect the new trial.

Error to superior court of Grand Rapids; Newnham, J. Submitted November 16, 1905. (Docket No. 141.) Decided March 5, 1906. Rehearing denied June 4, 1906.

Case by Edward B. Moon against the Pere Marquette Railroad Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed.

*F. W. Stevens* (*Charles McPherson* and *Benton Hanchett*, of counsel), for appellant.

*E. A. Maher*, for appellee.

OSTRANDER, J. Plaintiff was fireman on the locomotive pulling defendant's passenger train (No. 5), and was injured in the collision occurring December 26, 1903, of said train, west-bound, and passenger train No. 6, east-bound. There was a verdict and judgment for the plaintiff. It is stated in the main brief for defendant that the assignments of error present but two questions for consideration, which are:

" 1. The trial judge erred in admitting evidence that after the collision the defendant changed its rules in such a manner as to prevent a recurrence of such an accident and discharged the operator at McCords, and in a single instance subsequent to the collision adopted a different method in stopping a train at McCords than that by which it was attempted to stop No. 5 on the night of the collision.

" 2. The trial judge erred in submitting to the jury the question of whether or not the order was telegraphed to McCords in time for delivery to No. 5 at that station and in holding, on defendant's motion for a new trial, that the verdict and the special finding of the jury that the order was not received simultaneously by the operators at Ninth avenue and McCords were supported by the evidence."

This brief was filed September 14, 1905, and the brief for appellee was filed October 3, 1905. Later, and on October 23, 1905, another brief, which is for the most part in form and substance an original brief and not a supplemental brief, was filed, by other counsel for defendant, in which brief a question is presented and an argument made entirely outside the lines of the main brief, based upon the charge of the court to the jury. In this brief, too, a statement of facts is presented. As counsel for appellee has, without objection, replied to this later brief, it will be considered. The practice followed is not approved, the rule requiring, and the court insisting, that the points relied upon in this court shall be stated in the main brief for appellant.

1. To the first question, counsel for plaintiff make the answer, *first*, that the objections made to the introduction of the evidence were not sufficiently specific and did not suggest the real objection, and that, the specific ground of objection not having been stated in the trial court, reversible error will not be found; *second*, that the testimony so admitted was rendered harmless by the charge. It might safely be assumed that the purpose of counsel in offering the objectionable testimony and the meaning of the objection that it was "irrelevant, immaterial, and incompetent," was understood by counsel and by the trial court. The record discloses, however, that as to evidence of the change of rules not only was the above recited objection interposed, but counsel for defendant also objected, before the examination was concluded, and with reference to a question calling for the particular operation of the new rules, that what was done after the time of the collision was wholly irrelevant. Thereafter, counsel for defendant moved to strike out the evidence as incompetent and irrelevant, and, upon denial of his motion, took an exception. To the testimony concerning the method adopted at Mc-Cords to stop a train upon the first occasion after the collision that such orders were received there, the objection was that it was irrelevant and immaterial. No one can read

the record without concluding that this testimony was peculiarly harmful. It was admitted over objection, no reference was made to it in the charge, and its effect may or may not have continued notwithstanding the charge. The case is a very close one upon the facts. If counsel will persist in presenting such evidence to juries, this court, unless reasonably certain that no harm resulted, must persist in setting aside verdicts. See *Fulton Iron & Engine Works* v. *Township of Kimball*, 52 Mich. 146; *Lombar* v. *Village of East Tawas*, 86 Mich. 14; *Langworthy* v. *Township of Green*, 88 Mich. 207; *Polzen* v. *Morse*, 91 Mich. 208; *Noble* v. *Railway Co.*, 98 Mich. 249; *Zibbell* v. *City of Grand Rapids*, 129 Mich. 659.

2. By schedule, train No. 5 should have arrived at Grand Rapids at 5:15 o'clock p. m., and train No. 6 was due to leave Grand Rapids for Detroit at 5:20 p. m. It is a single track railroad. Train No. 5 was behind time, and it became necessary to arrange a passing point for these trains. The office of the train dispatcher was at Plymouth. As train No. 5 proceeded, its time of passing stations was reported to the dispatcher. It was a fast train and did not stop at all stations. It was scheduled to stop at Lake Odessa and at Elmdale. From Lake Odessa, the stations, the distance of each from Detroit, and the schedule time of No. 5, are shown by the following table:

| Station | Miles | Time |
|---|---|---|
| Lake Odessa | 120.21 miles | 4:26 p. m. |
| Clarksville | 126.50 " | 4:34 " |
| Elmdale | 130.48 " | 4:40 " |
| Alto | 134.00 " | 4:45 " |
| Brannin | 135.15 " | 4:47 " |
| McCords | 137.45 " | 4:50 " |
| Fox | 142.57 " | 4:56 " |
| Oakdale Park | 149.35 " | 5:05 " |
| Grand Rapids | 152.16 " | 5:15 " |

Of these stations, Lake Odessa, Clarksville, Elmdale, Alto, and McCords were telegraph stations. There was

also a telegraph station at Ninth avenue in Grand Rapids.
By order No. 60, delivered to No. 5 at Lake Odessa, these
trains were to meet at Oakdale Park.   Later, by order
No. 62, the meeting place was changed to Fox.   The last
order was given to No. 6 at Ninth avenue, should have
been given No. 5 at McCords, but was not, and the
trains met at a point between Oakdale Park and Fox.
The question of defendant's liability is solved when re-
sponsibility for nondelivery of this order to train No. 5 is
rightly placed.   The court below submitted the case to
the jury upon the theory that to warrant a recovery it
must be determined that the collision resulted from the
fault of the train dispatcher.   The only request to charge
presented by counsel for defendant was one that plaintiff
could not recover.   They did prepare and, at the conclusion
of the charge given, submit, five special questions to be
answered by the jury.   Each of these was answered
against defendant's contention, the fourth in the affirm-
ative, the others in the negative.   The questions were:

"*First Question.* Was the order changing the meet-
ing place of trains Nos. 5 and 6 from Oakdale Park to
Fox on December 26, 1903, received simultaneously by the
telegraph operators at Ninth avenue and at McCords?

"*Second Question.* Before the train dispatcher ordered
train No. 6 to proceed from Ninth avenue to Fox, on De-
cember 26, 1903, had he received from the telegraph oper-
ator at McCords information that the proper signal had
been displayed to stop train No. 5 when it reached Mc-
Cords?

"*Third Question.* Before train No. 5 had arrived at
McCords on December 26, 1903, had the telegraph opera-
tor at that station turned the order board, and the lamp at-
tached to the order board, to the proper position to signal
train No. 5 to stop at McCords?

"*Fourth Question.* When train No. 5 arrived at Mc-
Cords on December 26, 1903, was the light in the lamp at-
tached to the order board at that station burning?

"*Fifth Question.* In changing the meeting place of
trains Nos. 5 and 6 from Oakdale Park to Fox on Decem-
ber 26, 1903, did the train dispatcher take all of the pre-
cautions for the safety of trains prescribed by the so-called

'Standard Rules' for the movement of trains by train orders, prepared by the American Railway Association?"

The jury fully understood the meaning of the first question submitted to them. As originally prepared, the inquiry was whether the message was "transmitted simultaneously." After being out for a time, the jury returned into court and a colloquy occurred, in the course of which a juror said: "The operator may not have been there and still the order might have been transmitted "— and the form of the question was changed. Accepting the theory that to entitle the plaintiff to recover, negligence of the train dispatcher must be established, the first and second special questions reach the very marrow of the issue. Indeed, the second question, if answered in the affirmative, might control the general verdict and such affirmative answer would not, necessarily, be inconsistent with the answers which were returned to the other questions.

We are convinced, from a careful reading of the record and briefs, that the testimony so strongly requires affirmative answers to these two questions that the motion for a new trial should have been for that reason granted. If the catastrophe could be reasonably accounted for only by answering these questions in the negative, the evidence would appear to be more evenly balanced. A meeting place for the trains had been arranged, of which arrangement the crew of train No. 5 was informed at Lake Odessa and the crew of train No. 6 before they left Grand Rapids. If train No. 6 passed Ninth avenue, about a mile from the Union station, or if train No. 5 passed McCords, one of them only having received the order to meet at Fox, a collision was certain, unless No. 6 reached the siding at Fox before No. 5 arrived there, because the trains, after passing those points respectively, were beyond reach of telegraphic orders. An order was made changing the meeting place and was regularly communicated to those in charge of train No. 6 at Ninth avenue. The wire used by the train dispatcher runs into each telegraph office on

the line, and each message sent is repeated in each office. Order No. 62 could have been read at McCords. It was as necessary that it should be read there as that it should be read at Ninth avenue. The testimony of the dispatcher, of the operator at Ninth avenue, of the operator at Alto, and of the operator at McCords is that the order to stop No. 5 at McCords was given and was responded to before the order to No. 6 at Ninth avenue was made complete. It was the rule and the practice in transmitting train orders to call the required station by initial letters and, getting a response, to signal "31." This signal meant, "Clear the line for train orders." Upon receiving such signal, it was the duty of the operator at a station so called to at once, by using a lever convenient to his operating table, display the stop signal. The response to the call is "58," meaning, "Stop displayed," or "X," meaning, "Train will be held until order is made complete." It is the rule of the defendant that when a "31" train order has been transmitted, operators must acknowledge its receipt at once in the succession in which the several offices have been addressed and in the following form: "[Number of train order] to [train No.] X," with the operator's initials and office signal. After the "X" response has been given, the order must be repeated from the manifold copy made. "Each operator receiving the order should observe whether the others repeat correctly." It is a rule of defendant, also, that when the "X" response has been given and before the "Complete" has been given for a train order, it must be treated as a holding order for the train addressed, but must not otherwise be acted upon until "Complete" has been given. After order 62 had been transmitted, and after, as all witnesses who know the facts state, it had been X'd at McCords and made complete at Ninth avenue, the dispatcher began the transmission of another order, No. 63, to train No. 34 from Grand Rapids to Saginaw and to train No. 5, fixing a meeting place for those trains. This order was not completed. As received at Ninth avenue, it read: "To C.

& E. No. 34; No. 5 Eng. 397 will meet No. 34 Eng. 61 at Oak——." It was interrupted by the operator at McCords breaking in with the words: "My God! my bug is out! 5 is by," or "past." The operator at McCords was a man upwards of 55 years of age, who had been a telegrapher for 40 years, and had worked all of his life in connection with railroads. He had been employed by the defendant and preceding owners of the road for 17 years; at Mc-Cords, about 10 months. He testifies that the train dispatcher was calling him when he returned to his office from a trip to the post office after the mail for No. 6; that the dispatcher said, "No. 5," and he answered, "Not yet." The signal "31" immediately followed, and he immediately turned his order board in which the light was burning. He further testified that when he had finished repeating the order No. 5 was "right there" and kept on going. Failing to stop the train by use of a lantern, he thought, he says, to save No. 6, and broke in on the train dispatcher with the words: "My God! my bug is out! and No. 5 has got by."

The train dispatcher had had 16 years' experience as operator and dispatcher. In explaining the record made by himself, the train dispatcher testified:

" *Q.* Now, what have you to say as to whether, as a matter of fact, you released No. 6 before you got the ' X ' response from McCords showing that the other train would be held ?

" *A.* As the circumstances were a little out of the ordinary I remember the case in this way: The order was sent to the operator at Ninth avenue—to both, in fact, at the same time. When the operator at Ninth avenue, as I said before, started to repeat his order, or ' X'd ' his order, when [then] I stopped him and received the ' X ' from McCords, and in all probability I failed to put the time down at that time of the ' X.' Then after having the order repeated from McCords, after it had been repeated by Ninth avenue, I put down the time here, which was probably at 5 :34; but as a matter of fact, the ' X ' response was received from McCords between 5 :32 and 5 :33.

" *Q.* And that was before you released No. 6 ?

" *A.* Before I released No. 6."

That record was:

"(62) No. 6 J. G. x G. A. O. 533 P.    Canwell 533 P.
"No. 5 D. I. x T. B. 534 P.
"No. 5 Eng. 397 will meet No. 6 Eng. 183 at Fox instead of Oakdale Park.    No. 6 will take siding."

It agrees with the order given to the conductor of No. 6, so far as it relates to No. 6, with the exception that the conductor's copy indicates that the operator at Ninth avenue replied by the signal "X" at 5:32.    But the copy indicates that at 5:33 the message had been received, repeated, and made complete.    Being made complete, it released the train.    That part which refers to No. 5 means that operator at McCords (whose call was "D. I.") will hold train No. 5 for order No 62 and get the conductor's signature.    "5:34" means the time when operator at McCords "X'd" and initialed the order.

In denying defendant's motion for a new trial, the trial judge stated all, substantially, of the testimony which can be said to dispute the positive evidence of defendant's witnesses, and also stated inferences which in his judgment the jury might properly have drawn.    A part of his statement is here set out:

"At the close of the plaintiff's evidence, a motion was made on behalf of the defendant that the jury be instructed to return a verdict of no cause of action.    The court denied the motion, being of the opinion that the evidence clearly tended to prove a prima facie case against the defendant, assuming that the evidence correctly stated the facts.    It appeared that at the time the plaintiff was injured he was acting in the performance of his duty without notice that any change had been made, or attempted to be made, as to the meeting place of the two trains; that the order directing such change had been made complete to No. 6 at Ninth avenue before the dispatcher had received any answering signal from McCords, where, if anywheres, he had attempted to communicate with No. 5.    *    *    *

"For the purpose of meeting the case made by the plaintiff, the defendant called as witnesses its train dispatcher, Marzolf, and the operators, Oberly and Booth, at

Ninth avenue and McCords respectively, whose testimony on direct examination and standing by itself, tended to show that there had been a substantial compliance with the rules made to govern the dispatching of trains.    Their cross-examination, however, together with the records relative to train order No. 62, disclosed circumstances which the jury had a right to consider in deciding upon the facts of the case as well as the credibility of the witnesses themselves.    It was shown that L. M. Booth, the operator at McCords, had testified at a coroner's inquest that he entered the telegraph office at McCords at 5 :33, having been absent therefrom for a time, and received the call to take the train order at 5 :34.    The clocks in all the offices were set every day at 11 :00 a. m.    If Booth's inquest testimony was correct, he could not have been in the office when the order, changing the meeting point of the trains, was sent to Ninth avenue.

"It is true that Booth testified that he afterwards corrected his evidence at the inquest, so as to state that he received the train order signal at 5 :33; but the order received and delivered at Ninth avenue indicates that it had been received there at 5 :32.

"Booth testified that upon receipt by him of signal ' 31 ' to take the train order, he answered ' 58,' meaning. ' Stop displayed,' while Marzolf says no such response was made.    So Booth testified that he first saw No. 5 when the engine was nearly in front of the telegraph office at McCords, while at the coroner's inquest he said he could see the train from his office window a half mile away, and that he saw it coming down the hill; there being quite a grade east of McCords.    Had Booth received the order at McCords, it would have been his duty to have transcribed it as it was being received, and to repeat it back from his transcript.    He testified that he received and repeated back the order, but no evidence was offered of his having made any transcript of it.

"The testimony pointed strongly to train dispatcher Marzolf as the individual whose personal negligence caused the collision.    He appears, by his own testimony, to have been very anxious to save time of train No. 6.    To have stopped No. 5 before releasing No. 6 would only have delayed the latter 2 to 2½ minutes.

"Marzolf said that he tried to call the operator at Alto before calling Ninth avenue, but failed to get any response. The Alto operator testified that he received the call and

answered, reporting No. 5 as passing at 5:30. Marzolf knew that No. 6 had then left the Union Station and asked Ninth avenue if it could be stopped there for an order. The Ninth avenue operator says he sent out a flagman to stop the train and then answered that he could; that Marzolf then sent the order and was given the ' X.' The record at Ninth avenue shows this to have been at 5:32. The conductor on No. 6 signed for the order and the signature was reported to Marzolf, and he made the order complete at 5:33. If Booth at McCords did not receive the call to take the order until 5:34, and was not in his office until 5:33, as he testified at the coroner's inquest, it is plain that the order was not received simultaneously at McCords and Ninth avenue.

"The distance from Alto to McCords is 3.38 miles. The schedule time was five minutes, or 40.56 miles per hour. If the run was made in four minutes, it would have been at the rate of 50.70 miles per hour; and if in three minutes, 67.60 miles per hour. It was down grade the greater part of the way, and the engineer was authorized to increase the speed of the train. One of the witnesses estimated that the run was made in three minutes. The fact found by the jury that the order light was burning clear at McCords when No. 5 passed, as testified by the plaintiff and engineer Waterman, together with other evidence in the case, fairly indicates that order No. 62 was not transmitted to McCords in time for the operator to display the stop signal before No. 5 arrived."

It is to be considered that the precise and vital question is not whether the operator displayed the signal. It is whether the train dispatcher had received from the operator at McCords the response indicating that the signal was displayed, and had thereafter, and before releasing train No. 6, transmitted the order No. 62. Every person who has knowledge says that the response was given and the order transmitted. If the response was given, then, unless it is established by plaintiff that the dispatcher was not justified in relying upon and in acting upon the information which it conveyed, the plaintiff did not, upon the theory adopted by the trial court, make a case. If the testimony of the operator at McCords does not agree in all particulars with the testimony which he gave at the inquest, there is

no variance upon the point now under consideration. If the memory of this witness is believed to be treacherous, or if his truthfulness is doubted, there remains the testimony of the dispatcher and of the operators at Alto and Ninth avenue.

What has been said disposes substantially of the contentions made in this court.

The judgment is reversed, and a new trial granted.

GRANT, MONTGOMERY, and Hooker, JJ., concurred.

BLAIR, J. I concur in reversal on first ground stated therefor.

### ON MOTION FOR REHEARING.

PER CURIAM. We are agreed that the motion of plaintiff for a rehearing should be denied. Certain claims made by counsel seem to warrant brief notice. The case was brought into this court by the defendant. The order of this court, agreed to by all the justices who heard the case, was that the judgment below be reversed and a new trial granted. The opinion which was filed, ante, 126, discusses two of the grounds urged for reversal. As to one—the first—of these, based upon the improper admission of testimony introduced on the part of the plaintiff, the unanimous assent of the justices is given. As to the second ground, viz., that the court below should have granted a new trial because the weight of evidence upon certain points required it, four only of the justices join in the opinion. It is assumed by counsel that, in effect, a dissenting opinion was filed. It is argued that the second ground urged for a reversal and discussed in the opinion will be urged upon a new trial, and that, therefore, no doubt should exist as to the opinion of the court upon that point. If it were true, as is now asserted by counsel for defendant, that four of the justices were of the opinion that "two of the answers of the jury to special questions were not supported by the evidence," or that "the evidence was not sufficient to support" a certain finding made by

the trial judge upon the motion for a new trial, it might be true that a rehearing upon those matters would serve the ends of justice.   But both these assertions are unwarranted, and are noticed only because it may be assumed, to the advantage or disadvantage of one of the parties, that by merely denying a rehearing assent is given to the claims made.   Whatever conviction may result from the arrangement and presentation of the facts in the opinion, the point and the conclusion are both stated in the following language:

" We are convinced, from a careful reading of the record and briefs, that the testimony so strongly requires affirmative answers to these two questions that the motion for a new trial should have been, for that reason, granted."

See *Hintz* v. *Railroad Co.*, 132 Mich. 305.

In the conclusion just stated, one of the justices who heard the case did not concur.   This fact does not change the result, nor can a new trial be in any manner affected thereby.